Good morning, Your Honor, and may it please the Court. My name is Jim Kuhn. I'm arguing on behalf of the claimant in this case. I'd like to set the chronological framework here because there's a considerable period of time in the record. The claimant filed his application for benefits in 2005, so the furthest back he can go to get benefits is to 2004, January of 2004. He alleged an onset back in September of 2001, but, in fact, the only benefits that he can get would begin in 2004. I'd like to focus on the assignment of error that has to do with the treatment of the lay witness testimony, specifically the testimony of Mr. Batson, who was the employer who gave the claimant a job, allowed him a tryout at the nursery work in October of 2004 to January of 2005. As is familiar, I'm sure, to the Court, when treating lay witness testimony, an ALJ, if he or she wants to reject the testimony, must give reasons germane to each witness. The ALJ's entire rationale for rejecting the testimony of both of the lay witnesses in this case was, quote, the undersigned finds the third-party statements of record to be similarly less than fully credible, period. That's it. Similarly, appears to refer to the paragraph, and this is at ER 728. Well, what conclusions did the supervisor – what conclusions do you want us to draw from the supervisor's testimony? The supervisor said – I mean, I know what he said was like a page long is all, or a page and a half in the record. Right. And we really – we focused on the statements that said things like he required – the claimant required step-by-step supervision. I'd give him a job, and I'd have to go back two or three times to make sure he was doing the thing right. But, I mean, there's no showing that the ALJ just rejected that. I mean, I find it helpful – I mean, lay testimony so often is not very helpful anyway. I mean, it's anecdotal as opposed to like a vocational expert or somebody that – or a doctor who examines somebody and is somewhat neutral in it. Well, I'm not sure that this witness wasn't neutral, and the ALJ, of course, didn't say anything about him not being neutral. The fact that in actual experience and at the relevant time – this is the end of 04 and beginning of 05 – an employer tells us what this claimant was and was not capable of doing on the job I think is of some help. And the ALJ didn't reject it on the ground that it wasn't helpful or on any ground. He didn't address it. That's right. I don't think he – he didn't say, I reject this. This is totally unbelievable. He simply said, yeah, okay, it's less credible or some statement like that, correct? Right, but I think the law is pretty clear that he needs to make specific findings about what it is he's rejecting and why. And I also think it's well understood that to ignore testimony is to reject it. I understand, but it seems he didn't draw the conclusion that you can't – I think this guy is totally fine. I don't know what you people are talking about. You know, so, I mean, it seems like he did give it some credibility. It's simply he didn't give it the controlling credibility that you would like. Well, he didn't – he didn't credit it for purposes of his hypothetical. And, I mean, once we get to that, now we're talking about whether it was harmless error if it was error. Yes, that was going to be my next question. Judge Marsh obviously concluded that there was error, but it was harmless. And you seem ready to – about ready to discuss that. Yes. And certainly the government argues, well, yeah, okay, so this was harmless error because the ALJ gave a hypothetical that included the limitation to simple tasks, simple repetitive tasks. And I guess where I go from there is to stout against Commissioner. I mean, the standard for harmless error in a case where we're talking about the rejection or ignoring of lay witness testimony is not do we think it's covered by the hypothetical. It's could any ALJ who's a reasonable ALJ fully crediting this testimony reach a different result. And it's – I think a reasonable ALJ could. A reasonable ALJ could say it's a different thing to have to constantly supervise someone to make sure they're doing what you told them than it is to simply say, well, we'll only give them simple jobs. You can give somebody a simple job, but that doesn't answer the question are they going to be able to go over there and do it independently without you checking back with them repeatedly. And Mr. Batson's testimony would be that, in fact, no, you had to check back repeatedly. You had to go back and make sure he was doing what he had been told to do. So I think given especially the stout standard, it's not really whether I can convince the Court that, in fact, these two things are different. It's whether any reasonable ALJ could find that they were meaningfully different. And I think a reasonable ALJ could make that finding that, in fact, if you've got to constantly be going back and checking on somebody, that doesn't answer the question, well, did you give them a simple or a complicated task. Sure, with a complicated task, you might have to check more frequently or you might think you would have to. But those are not the same question. A reasonable ALJ could say that they were not the same question. So that's – we don't believe that under stout it's harmless error. I think stout lays out pretty clearly, you know, what that standard is. This Court has to be clearly convinced, firmly convinced, that no reasonable ALJ could make that finding. Is there anything in Mr. Maples' testimony, the uncle's testimony, that – I don't think – I don't think the uncle's testimony, frankly, is that clear and helpful, so that we could say, well, look at that statement. That's really not included. Maples also runs a little bit more afoul of the Valentine case. The government cites Valentine. And Valentine, of course, was a case where the wife's testimony was at issue and the ALJ didn't mention it. And the panel of this Court said, well, you know, obviously the logic of that was that she said the same thing and it was the same reasoning. If you look at that case, there were other reasons why the wife was considered to be not credible in that case. She was, you know, she was an interested party. You know, she never saw the claimant at work. There were some other reasons. And in that case, the Court just said, well, it's harmless error anyway, and didn't really explain why. I don't think Valentine controls this case where you've got an independent witness who was an employer. Arguably, I believe the best kind of witness you can have in terms of on-the-ground, actual, what's this guy capable of doing. So we would suggest that Valentine – I would note in Valentine that the Court reminds ALJs, well, you know, be this as it may, please do specifically address each witness's testimony with a rationale that's germane to that witness. And I really don't think there's any argument that that happened in this case. Do you want to reserve some time for rebuttal? I will, yes. Thank you. We'll hear from the government. Good morning, Your Honors. David Johnson representing the Social Security Administration. The difference between Stout and the present case is that in Stout, the lay witness testimony was silently disregarded. It was ignored. Here, I think Valentine is clear that it sets out a legal rule that rejecting the lay witness testimony for the same reasons as the claimant's testimony or statements were rejected is a valid legal principle. But in any case, what Mr. Batson had to say about Mr. Jordan not being able to perform the work at the nursery is correct. If he had been returned to his past relevant work, if Mr. Jordan had been required in the residual functional capacity to address more complex instructions, more complex tasks, he wouldn't be able to do that. The ALJ did not find that Mr. Jordan had those capabilities. He limited to simple, repetitive tasks. It was not the kind of work at the nursery that you might see with the noise in the background of take these strawberry plantings over to greenhouse number six, mulch them, pesticide them, fertilize them, and then bring back the potato plantings from number 12 and put them in number three. It's simple, repetitive work of assembler, inspector. These things come down the line. You put these two together, send them down the line. These things come down the line. If there's a flaw, pull one off. Simple, repetitive. He doesn't need constant instruction because he learns it within 30 days, and all the jobs that were identified were unskilled. He testified, did he not, that he had trouble with even simple tasks like finding the right row to hoe in the nursery, as I recall. Actually, when asked about trouble concentrating while weeding, he testified that the problem was with his back and shoulder, a lot of bending and a problem with his shoulder while weeding. Right, but then he went on to say something about he was a little bit confused about the instructions. Although I must say, when you ask him, were you confused about the instructions, and he said, my back hurt, it does sort of indicate he was a little confused about graphs in general. I'd say there's substantial evidence, more than a scintilla, for the ALJ's finding, and it was correctly based. In addition, most of the statements of the lay witnesses were accommodated in the residual functional capacity finding. As far as listening and hearing, Mr. Maples stated that Mr. Jordan does follow instructions good if Mr. Jordan hears well, and that's at 44. Counsel, I have a question about Mr. Batson's statement. It does refer to complex instructions, but it also has the following statement in it. If I gave him one job to do and told him exactly how I wanted it to be done, I would still need to come back two or three times to make sure he was doing it correctly. He had a poor memory and became easily frustrated. Does that, fairly read, refer to simple tasks as a distinct category from the statement elsewhere in Mr. Batson's comments that complicated tasks were beyond the claimant? I would say it doesn't, in and of itself, necessarily refer to simple tasks. It's unclear what tasks he's being exact about and how exact he's being. The nature of the work in general did not involve simple tasks. It involved multiple steps, and that's why he couldn't return to it. And so if he's being very exact about multiple steps, we can understand, as Dr. Witcher found, that he might have some difficulty. And that's why the limitation in the RFC finding to, regardless of what the nursery job requires, only simple repetitive tasks. And then the vocational expert testified to jobs that are unlike the nursery job. So the lay witness statement is only helpful insofar as it goes, and it doesn't explain thoroughly that he could not do or that Mr. Batson even had the opportunity to observe him doing the kind of work that's contemplated by the RFC. Well, you know, it strikes me that your explanation might be a very good one, but it isn't the explanation that the ALJ gave. And we're limited to reviewing what actually was decided. We can't supply other good reasons that might have been. And I guess that's troubling to me, and if you'd comment, I'd appreciate that. Certainly. I'm not trying to provide a new rationale. I'm trying to explain the details, and the ALJ's decision could have been more detailed. If he had laid out exactly what portions of the statement were and were not credited in the RFC, that would have been nice, but it's not required. We can see through our analysis that the residual functional capacity captured the limitations that the lay witnesses opined, for the most part, and that the basis that the ALJ did give to the extent that the claims are similar to the claimants, I reject them for the same reasons as the claimants' credibility, that's a legal basis. How is that even rational? If the supervisor is saying, this was my personal experience, this is how I experienced this person, how is that even dependent on or related to the claimants' personal credibility? It's only rational to the extent they're talking about the same sort of claims. So we start with the understanding that Mr. Batson was talking about complex tasks, which were excluded from, that was found credible, that they were excluded from Mr. Jordan's capacity to still do. If there were claims that were talking about the same sort of tasks as the credibility factors addressed, such as the shoulder and bending causing problems with the weeding, when in fact Mr. Jordan claimed that ibuprofen or Motrin almost always controlled his physical pain, then those claims would be just as non-credible coming from a lay witness as they are coming from Mr. Jordan. But we've got to start with the proposition and the understanding that the residual functional capacity captured the limitations that Mr. Batson and Mr. Maples opined. The credibility finding, well, let me go to Dr. Witcher, who the ALJ also accepted her opinions of limitations, but they're not as extreme as the plaintiff points them out to be. She found that he had moderate limitations, as did the ALJ. She found that sustaining work for him would be more challenging, and that's certainly true. The question is what are the challenges, and those are encompassed in the residual functional capacity finding. When you look at the record as a whole, it's kind of hard to believe that this man can work consistently at a job, don't you think? No, I don't think, because when asked at the hearing, have you sought work and why aren't you seeking work, it was because of his home situation, where he lived. If he had work, he could no longer live at the shelter. That's a practical reason. It's not a medical reason. The statutory requirements are that medical conditions cause your inability to work. When he felt that his depression medication was no longer effective, he went to his treatment providers and sought greater help, and he got a change of medication. I want to go back to what you just said. You said that he testified that he couldn't work because of his home situation. I understood his testimony to be because he couldn't work because of pain in his back and his high level of frustration. If he hears, he doesn't he just forgets. I mean, he gives a whole explanation about his physical problems. I'm sorry, not that he couldn't work, but that he was not currently seeking work because. Okay, all right. I misunderstood what you said then. Thank you for clarifying that. When he did work, in fact, through the entire period that he claimed, not the entire period, I'm sorry. After claiming he became disabled, he continued to work for several summers at the seasonal job and was rehired. So can this man, looking at the whole record, do any work? Apparently he can. Apparently he did while he claimed disability. It has to be the right kind of work. It has to be limited appropriate to his conditions. What are his actual conditions? Well, we have more than a scintilla of evidence to support the ALJ's findings about his actual limitations. And an expert testifying with those limitations, he could do simple repetitive work with limited public contact. Any further questions of the panel? Thank you, counsel. Thank you. We'll hear from Bob. Just briefly in response, Your Honor, I believe counsel said we start with the idea that the RFC captured the lay witness testimony. That's the harmless error argument. I don't believe we start there. We start with is there error, and then we go, well, is it harmless? I think it is important to look at what the rationales were that the judge gave for disbelieving the claimant. And to ask the question, do those actually have anything to do with what Mr. Batson said about 2004 and 2005? The only piece of rationale that concerns the claimant's mental capacity is when the judge says, well, he was injured in 1986 when he was hit by a car, and he worked for 10 years thereafter. That's it. Everything else is about the physical stuff. But what Mr. Batson says is about his mental capacity, his ability to do something without constant supervision. The ALJ's rationale about his working for 10 years after 1986 really doesn't tell you anything about what Mr. Batson saw in 2004, 2005. So even if the judge was really thinking, yes, that reasoning is why I'm rejecting Mr. Batson, and I suggest he didn't really say that, but even if you infer that, it doesn't make any sense. It's about what happened in 1986 to 1996. And it's not about what Mr. Batson saw. I also don't agree that if one tries to infer from Valentine, as counsel apparently does, that as long as you disbelieve some testimony about X, then everybody else who says anything about X is subject to the same rationale that you had for disbelieving this testimony about X. That's not rationale or reasoning germane to each witness. I don't think Valentine meant to overrule Dodrell, and Dodrell, of course, has been cited many times since Valentine. So we believe that it still applies, and that this rationale, well, for similar reasons, I just believe all the third parties really can't qualify as reasoning that is germane to each witness. I think you have to look at this as fully crediting, understood, fully crediting what Mr. Batson had to say. If this counsel argues and concedes that Mr. Batson perhaps isn't as clear as it might be, well, that leads to a conclusion that an ALJ, irrationally an ALJ, could look at that testimony and could reach a conclusion different than this ALJ did. And if that's true, the error was not harmless. We would ask for reversal and remand. Thank you, counsel. The case is currently submitted for decision.
judges: Mahan, Thomas, Graber